Matter of the Assessment of SOUTHWEST CHEMICAL SUPPLY, INC., OF ENID, Oklahoma.
SOUTHWEST CHEMICAL SUPPLY, INC., Plaintiff in Error,
v.
OKLAHOMA TAX COMMISSION, Defendant in Error.
No. 38740.

Supreme Court of Oklahoma.
May 17, 1960.

Frank Carter, of Otjen & Carter, Enid, for plaintiff in error.

E. J. Armstrong, E. Moses Frye, Oklahoma City, for defendant in error.

BLACKBIRD, Justice.

Plaintiff in error herein appeals from an order of the defendant in error, hereinafter referred to as the "Commission", upholding an assessment of this State's Sales Tax against it on its sales, over a three-year period, beginning in 1955, to

Union Equity Cooperative Exchange and Pillsbury Mills of various quantities of fumigants for the latter's use on the wheat in their bins and/or elevators.

Plaintiff in error, hereinafter referred to as protestant, did not collect, from the named vendees or consumers, any such tax on those sales, on the theory that they were exempted from the tax under the provisions of Title 68 O.S.1951 § 1251d, which said exemption reads as follows:

"There is hereby specifically exempted from the tax imposed by this Act the gross receipts or gross proceeds derived from * * *:

*    *    *    *    *    *

"(p) (1) Sales for resale to persons regularly engaged in the business of reselling the articles purchased, * *.

"(2) Goods, wares, merchandise, and property sold for use in manufacturing, compounding, processing, assembling or preparing for sale, shall be classified as having been sold for the purposes of resale or the subject matter of resale *only in the event* (a) such goods, wares, merchandise, or property are purchased for the purpose of being manufactured into a finished article and if it becomes a recognizable, integral part of the manufactured, compounded, processed, assembled or prepared products, *or* (b) *if it is consumed in the process of manufacturing, compounding, processing, assembling or preparing products for resale."* (Emphasis ours.)

It has been protestant's position, both here and at the hearing on its protest before the Commission, that the fumigants involved are exempt under the latter, or emphasized, portion of the above-quoted Statute, because they are "consumed in the process of manufacturing, compounding, processing, assembling or preparing products for resale" within the meaning of that provision.

At the Commission's hearing, it was stipulated, among other things, that the fumigants involved are "Fumicide" and "Fumi-

cide 75–X", both of which are liquid compounds, classified by the United States Department of Agriculture as "economic poisons", containing certain named chemicals in solution that, when poured into bins with wheat, is entirely consumed by vaporizing and forming a gas around the wheat grain berries, killing or destroying any larvae or weevils that may be alive in the wheat.

According to the stipulated testimony, Union Equity Cooperative Grain Exchange, the vendee in part of the sales of both compounds, is a wheat marketing organization which stores wheat in elevators awaiting shipment and delivery to millers. Part of this wheat is held for the account of Commodity Credit Corporation under an agreement requiring Union Equity, as warehouseman, at its own expense, to take all necessary steps to keep the stored grain "from going out of condition" and to "condition any such grain which is out of condition or in danger of becoming so, * *". Under the definition of "conditioning" written into the agreement, "fumigating" is included; and Union Equity's superintendent testified that fumigants such as those involved herein "are necessary to keep and prepare the grain for resale." In partial explanation, he testified that if the fumigants are not used, the grain heats and spoils.

It was further shown that Pillsbury Milling Company, the vendee in part of the sales of Fumicide 75–X, not only buys and stores wheat, but subsequently mills it into flour, which it sells for resale. Pillsbury's manager admitted, very significantly, that *when the wheat is purchased,* it meets pure food standards, and *if it was all milled into flour at that time, no application of fumigants would be necessary.* He further testified, however, that it is impractical for his Company, in its operations, to limit its wheat purchases to its current milling requirements, and that, accordingly, its purchases in excess of those requirements must be stored, which necessitates use of fumigants to keep it from heating and spoiling, before being milled.

After hearing the evidence, the Commission, in its order denying the protest and assessing the tax, rejected protestant's position, specifically finding that the fumigants and fumicides in question were not used or "consumed in the process of manufacturing, compounding, processing, assembling or preparing wheat for resale * * *".

In its first argument for reversal of the Commission's order, protestant contends that it is contrary to the evidence. It points to the unquestioned showing in the stipulated facts that the fumigants involved are preservatives of wheat, to the undisputed fact that they are entirely consumed by vaporization in preserving the wheat, and to undisputed testimony that use of fumigants is "necessary to keep and prepare the grain for resale." Protestant's counsel quotes dictionary definitions of the words "prepare" and "preserve", but they fail in supporting their statement that the former embraces, or includes, the latter to the extent necessary to bring the fumigant's use within the meaning of the statute's phrase "preparing products for resale." There is no evidence that wheat generally, or of itself, needs to be "prepared" for resale, or for milling into flour for human consumption, by being fumigated. The only evidence on the subject merely shows that such is necessary when the wheat is kept, or stored, over a period of time, and, furthermore, that if it is milled into flour when it is first purchased, no fumigants are necessary. Therefore, the reasonable conclusion to be reached from these facts is that fumigating is not a necessary part of preparing the wheat for resale or milling— but was rendered necessary, in the present case, only because of the way in which these purchasers of the fumigants operated their businesses. It is plain that the vaporized fumigant is not an integral, or necessary, part of wheat for human consumption, nor for any other purposes, or product, for which it is resold.

Protestant further argues, however, that as the Statute in question has been amended since our opinion in Colbert Mill & Feed Co. v. Oklahoma Tax Commission, 188 Okl. 366, 109 P.2d 504, by adding to it the quoted part following "(b)", it is now no longer necessary that the "merchandise" in question become a "recognizable", integral part of the "manufactured, compounded, processed, assembled or prepared products * * *", and that it is only necessary that it be "consumed in the process of manufacturing * * * processing * * * or preparing products for resale." Since, unquestionably, part of the fumigated wheat involved here never went into the making of flour or any other operation that might be called "manufacturing", protestant, in the latter part of its argument, ignores that word and emphasizes the word "processing". However, we are no more convinced that the subject use of fumigants is included in the statute's use of the word "processing" than we are that it is included in the phrase "preparing * * * for resale". We have examined many cases digested in 34 Words and Phrases defining "processing", and in none of them have we found an applicable definition that clearly includes the use of fumigants in the subject manner. All of the definitions that might be applied, connote, or imply, some change in the material processed. For instance, in Corn Products Refining Co. v. Federal Trade Commission, 7 Cir., 144 F.2d 211, 219, it was said that processing "effectuates change in form, contour, chemical combination, physical appearance or otherwise * * *"; and in National Tube Co. v. Glander, 157 Ohio St. 407, 105 N.E.2d 648, 650, it was said to imply essentially a transformation, or conversion, of materials or things into a different state or form from that in which they originally existed. It is not claimed in the present case that fumigating the wheat changes it from its natural state, either as to form, use, texture, consumable ingredients, or fitness for immediate milling or consumption. Therefore, while not denying that some preservatives, or preserving processes, may be of such a character as to add to, or effect a change in, the form or texture, etc., of materials or commodities processed, and be embraced in some statutes' uses of the word

"processing" (see Fischer Artificial Ice & Cold Storage Co. v. Iowa State Tax Com'n, 248 Iowa 497, 81 N.W.2d 437, 441; Kennedy v. State Board, 224 Iowa 405, 276 N. W. 205, 206) we are of the opinion that the use of the fumigants as preservatives in the present case does not come within the meaning of that term as it appears in Sec. 1251d(p) (2) (b). We therefore hold that protestant's arguments demonstrate no error in the order appealed from. It is therefore affirmed.

DAVISON, C. J., WILLIAMS, V. C. J., and HALLEY, JOHNSON, JACKSON and IRWIN, JJ., concur.